**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| DERRICK W. HOWARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-15-265-D |
| | ) | |
| OKLAHOMA DEPARTMENT | ) | |
| OF CORRECTIONS, a state agency; | ) | |
| MICHAEL ADDISON, an individual; | ) | |
| and MICHAEL SHELITE, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This matter comes before the Court on Defendants Oklahoma Department of Corrections (ODOC), Michael Addison, and Michael Shelite's (collectively, Defendants) Motion for Summary Judgment [Doc. No. 16]. Plaintiff Derrick Howard (Howard) has filed his response in opposition [Doc. No. 19], and Defendants have replied [Doc. No. 22]. The matter is fully briefed and at issue.

This lawsuit arises from Howard's employment as a corrections officer at the Joseph Harp Correctional Center (JHCC), where he alleges he was subjected to a hostile work environment and retaliated against due to his race and disability. Howard is African-American and suffers from Post-Traumatic Stress Disorder (PTSD). His claims arise under the civil rights statutes, specifically, 42 U.S.C. § 1981; the Americans with Disabilities Act (ADA), *as amended by* ADA

Amendments Act of 2008 (ADAAA), 42 U.S.C. § 12101 *et seq.*,[1] and the common law. At all relevant times, Defendant Addison was warden of JHCC and Defendant Shelite was JHCC's chief of security. The following material facts are undisputed, and, along with all reasonable inferences, are viewed in the light most favorable to Howard. *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017).

## BACKGROUND

Howard was employed at JHCC from June 14, 2010 to December 3, 2013. He states his problems at JHCC began in May 2012, when JHCC officer Lieutenant Dooley began harassing him. According to Howard, Dooley began to constantly monitor him on security cameras and accused Howard at one point not performing his security checks. Howard also states Dooley accused him of being too friendly with inmates and behaving like a "dirty" officer. In October 2012, Howard was accused of failing to provide medical assistance to an inmate who had suffered facial injuries in the segregated housing unit (SHU). Although the inmate's injuries were determined to have been accidental or self-inflicted, Howard was removed from SHU. Howard contends his removal was due to false

---

[1] Howard's state court Petition seeks relief under the Americans with Disabilities Act (ADA). Petition at 6 [Doc. No. 1-1]. The ADAAA's amendments to the ADA went into effect on January 1, 2009. The events that form the basis for Howard's disability discrimination claims occurred after this date; accordingly, the ADAAA is technically applicable here. *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1304 n. 1 (10th Cir. 2017). Consequently, the Court refers to Howard's disability-related claims as claims alleging violations of the ADAAA. *Id.*

accusations by another JHCC officer, Captain Day, whom Howard also accuses of racial harassment and retaliation, as discussed more fully below.

Howard describes an incident that occurred in November 2012 in which a random drug search was performed on JHCC employees by a K-9 unit. When Howard appeared, the K-9 officer, Sergeant Stephens, began snapping his fingers around Howard and made a gesture with his arm. The drug dog sat down, indicating Howard was in possession of contraband. Stephens told Howard to stay seated and asked for his identification badge. The same dog had previously sniffed at another employee, but Stephens pulled it away, commenting that the employee must have owned a female dog. No contraband was found on Howard, but the incident left him feeling embarrassed. Howard alleges he was targeted by Stephens, although there were other black officers present who did not draw attention from Stephens. However, another officer who had observed the incident believed Stephens' actions toward Howard were disrespectful, and an internal memorandum sent to Addison stated there was a sentiment among the inmate population that Stephens targeted minorities.[2]

---

[2] Howard also states that he was told Stephens did not like black people, had a vendetta against Howard, and referred to the Martin Luther King Holiday as "dead nigger day." The Court, however, declines to consider such statements at this stage since they constitute inadmissible hearsay. At the summary judgment stage, "the nonmoving party need not produce evidence 'in a *form* that would be admissible at trial,' but the content or substance of the evidence must be admissible." *Thomas v Int'l Business Machines*, 48 F.3d 478, 485 (10th Cir. 1995) (citations omitted).

During the same period, an inmate was caught in possession of a cell phone. The inmate accused Howard and two other officers (both African-American)[3] of bringing contraband into the facility. A yearlong investigation ensued, resulting in disciplinary action being recommended against officers and inmates. Howard was found to have given false statements concerning his ownership of a prepaid debit card. No disciplinary action was taken against him, however, and neither Howard nor the other officers were found to have brought contraband into JHCC. Officials at JHCC planned an undercover operation to determine whether Howard and other officers were bringing contraband into the facility, but there is no evidence in the record that the plan was implemented.

Howard describes another incident in which Captain Day expressed his disdain for a black inmate before Howard and other officers. Day repeatedly called the inmate "boy" while looking at Howard. This embarrassed Howard, who was the only black officer present, and he felt Day's comments were meant to dehumanize him. In addition, Howard also alleges Day falsely accused him of placing handcuffs too tight on an inmate. Howard believes Day's accusations were retaliation against him for filing a racial discrimination complaint.

---

[3] At the time of Howard's employment, JHCC employed only six black officers out of approximately 120 who worked at the facility.

Howard met with Shelite to discuss Day's conduct. During their meeting, Shelite told Howard that everyone says "boy" and he felt the term was innocuous. Shelite asked Howard if he was happy at JHCC and said he could get him a job someplace else where he could be happy. Howard felt his career had been threatened and filed an incident report. In his report, Howard stated Shelite "ha[d] his point of view made up" and believed his questions bore no relevance to the incident at issue. Howard and Shelite had three more encounters, two of which occurred in the JHCC parking lot. During the first incident, Shelite greeted Howard but became upset when Howard did not respond in kind. The next day, Shelite demanded a meeting with Howard, but Howard refused, stating he did not feel safe meeting with Shelite alone. The third occurred in Shelite's office, where Shelite intended to reprimand Howard for the previous confrontations. Shelite ordered Howard to sit down, but Howard refused and instead handed Shelite his attorney's business card. Shelite told Howard to leave and reprimanded him for failing to follow his directions and afford the respect and courtesy due an officer.

Howard filed two internal grievances with JHCC. His first grievance contended his aforementioned removal from segregated housing was due to continued harassment by Day and other officers in JHCC's security office. Howard concluded his complaint by stating, "[b]ecause of this latest charge I cannot even work overtime because of fear of being demoted and or losing my job PLEASE

5

HELP." (Emphasis in original). Howard's second grievance complained of Day's "boy" comments. Howard stated he had had "many incidents" with officers at JHCC, the latest of which was with Day. In his request for relief, Howard stated he "pray[ed] that this and other racial behavior would stop ... I do not want any RETALIATION for making this statement of this and ... other incidents that I am bring[ing] forward[.]" (Emphasis in original). Howard concluded by stating "I just pray that I can get this and other incidents resolved without any prejudice and no retaliation."

During Howard's employment, another JHCC officer emailed Addison and stated there appeared to be "an all-out attack" on Black officers at JHCC since Shelite's arrival. The officer's email cited several incidents other black/minority officers had with Shelite, including Howard's meeting with Shelite over Day's comments. Addison, in response, contacted ODOC investigators and stated that there was "an increasing atmosphere of alleged discrimination being voiced by several staff at JHCC." Addison shared his concern that such animosity was detrimental to the facility, affecting the inmate population, and requested an investigation be conducted to determine whether any of the allegations could be substantiated. ODOC's Civil Rights Administrator found that Day's "boy" comments were unbecoming for the workplace and in violation of policy and Day

was reprimanded. However, Howard's other complaints of racial discrimination were determined to be unsubstantiated.

On April 19, 2013, Howard filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) wherein he alleged he was being harassed and subjected to a hostile work environment. Howard cited the "false hit" by the drug dog, his separation from segregated housing, the allegations of contraband, and Stephen's alleged comments about the King Holiday. Howard contended that despite his protests, no corrective action was taken. On June 5, 2013, Howard amended his charge to include (1) allegations that Dooley continued to harass him, (2) Day's "boy" comments, (3) Shelite's alleged threats against him, and (4) the undercover operation that had been planned. Howard also stated that a recent investigation opened against him, discussed below, was retaliation for his repeated complaints of discrimination.

Each year, ODOC receives a list of individuals the Oklahoma Tax Commission (OTC) has deemed non-compliant with state income taxes. The list of employees who have been identified as non-compliant for three years or more is provided to ODOC human resources for further action. Although individuals who are listed as non-compliant for four years generally depart from ODOC for various reasons, employees with three or more violations have remained employed. Howard had a payment plan set up with OTC to pay his taxes; however, he stopped

making payments in May 2013. On July 12, 2013, a notice containing non-compliant JHCC employees, including Howard, was sent to Addison. Shortly after the list was issued, Howard took leave pursuant to the Family and Medical Leave Act (FMLA) to enter a substance abuse clinic. Howard's FMLA medical certification form provided a provisional diagnosis of PTSD and stated Howard was suffering from severe anxiety, alcoholism and depression, which he attributed to the harassment at JHCC. Howard said these conditions interfered with his ability to function and take care of his health. Howard informed Shelite that he was on anxiety medication.

Howard unsuccessfully applied for positions elsewhere, but was chosen for transfer to another facility, Lexington Assessment and Reception Center (LARC), where his pay, benefits, and duties would have been the same. Howard refused the assignment because Shelite had a friend who worked at LARC. On November 7, 2013, Howard was served with a Pre-Termination Hearing Notice based on his failure to pay taxes. The next day, Howard sent a letter to JHCC stating he was not returning to work due to stress. Howard did not appear at the termination hearing and on December 3, 2013, he was terminated from JHCC for failing to pay taxes. At the time of his termination, Howard's medical leave had been expended. Howard filed another administrative charge wherein he alleged he was fired for seeking medical leave and complaining of racial discrimination.

Howard filed suit against ODOC, Addison, and Shelite in Cleveland County District Court, alleging discrimination and retaliation based on race and disability. Howard also contended Defendants' actions constituted intentional and negligent infliction of emotional distress. Defendants removed the action to this Court and now seek summary judgment on the grounds that (1) Howard has not established a prima facie claim of either discriminatory treatment or retaliation; (2) Howard has not established that his work environment was hostile; (3) Defendants are not liable for Howard's ADA claim by virtue of sovereign immunity; (4) Howard has not established individual liability against Addison and Shelite; and (5) Howard has failed to establish a claim for either intentional or negligent infliction of emotional distress.

## STANDARD OF DECISION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Universal Underwriters Ins. Co. v. Winton*, 818 F.3d 1103, 1105 (10th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). The movant may make such a showing through the pleadings, depositions, other discovery materials, and affidavits. *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1142 (10th Cir. 2013). As stated, at the summary judgment stage, the Court views the facts in the light most favorable

to the non-movant, Howard, and draws all reasonable inferences from the record in his favor. *Dewitt*, 845 F.3d at 1306.

Although Howard is entitled to all reasonable inferences from the record, he must still marshal sufficient evidence requiring submission to the jury to avoid summary judgment. *Id*.; *Piercy v. Maketa*, 480 F.3d 1192, 1197 (10th Cir. 2007). Thus, if Howard bears the burden of persuasion on a claim at trial, summary judgment may be warranted if Defendants point out a lack of evidence to support an essential element of that claim and Howard cannot identify specific facts that would create a genuine issue. *Water Pik*, 726 F.3d at 1143-44. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998).

## DISCUSSION

### I. HOWARD'S CLAIMS UNDER THE ADAAA

#### A. Sovereign Immunity

Because state sovereign immunity is a threshold jurisdictional issue, the Court must address it first before it can reach the merits of Howard's ADAAA claims. *See Brockman v. Wyoming Dep't of Family Services*, 342 F.3d 1159, 1163 (10th Cir. 2003) ("Because state sovereign immunity is a threshold jurisdictional

issue, we must address it first when it is asserted by a defendant.") (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)).

Under the Eleventh Amendment to the United States Constitution, "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States...." U.S. CONST. AMEND. XI. "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). Agencies of the State of Oklahoma, such as ODOC, are treated as the state for the purpose of sovereign immunity under the Eleventh Amendment. *See, e.g., Eastwood v. Dep't of Corr. of State of Okla.*, 846 F.2d 627, 631 (10th Cir. 1988). Sovereign immunity, however, is not absolute. For example, Congress may abrogate a state's sovereign immunity if Congress "has unequivocally expressed its intent to abrogate the immunity, and ... has acted pursuant to a valid exercise of power." *Mojsilovic v. Okla. ex rel. Bd. of Regents for Univ. of Okla.*, 841 F.3d 1129, 1131 (10th Cir. 2016) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996)). Moreover, a state may waive its immunity by consenting to suit. *Estes v. Wyo. Dep't of Transp.*, 302 F.3d 1200, 1203 (10th Cir. 2002). Howard contends Defendants waived immunity when they removed his action to this Court.

The Tenth Circuit addressed a similar argument in *Estes, supra*. There, the plaintiff brought an ADA claim, as well as state law claims, against the Wyoming Department of Transportation in state court. The defendant removed the case to federal court, stating it was not waiving any constitutional challenges to the district court's jurisdiction. The district court concluded Congress validly abrogated the states' sovereign immunity for violations of Title I of the ADA, and the defendant appealed. On appeal, the Tenth Circuit was confronted with the question of whether the mere act of removing federal-law claims waives a state's sovereign immunity in federal court. Relying in part on precedent from the Supreme Court, notably, *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613 (2002), the Tenth Circuit concluded Congress did not validly abrogate the states' sovereign immunity from suit under Title I of the ADA, but the defendant waived its sovereign immunity for the ADA claim when it removed the case to federal court. *Estes*, 302 F.3d at 1206 ("We conclude that [defendant] has waived its sovereign immunity relative to the ADA claim even if it attempted to remove the present case simply to federal court to challenge the jurisdiction of the federal forum. ... It is only when a State removes federal-law claims from state court to federal court that it 'submits its rights for judicial determination' ... and unequivocally invokes the jurisdiction of the federal courts.") (citations omitted).

The court in *Estes* was confronted with a claim arising under the ADA and not the ADAAA. And although "the ADAAA is devoid of language purporting to negate the constitutional limitation upon the authority of Congress to abrogate state sovereign immunity recognized in *Garrett*," *Goodnow v. Okla. Dep't of Human Services*, No. 11-CV-54, 2011 WL 4830183, at *1 (N.D. Okla. Oct. 12, 2011), the Court finds no meaningful distinction between the rationale expressed in *Estes* and the present case with respect to Defendant's waiver of sovereign immunity. Accordingly, the Court finds that Defendants waived sovereign immunity for Howard's ADAAA claim when they removed the case to this Court, and Defendants' motion is denied on this issue.

## B.    ADAAA Discrimination and Retaliation

Alternatively, Defendants contend they are entitled to summary judgment on Howard's ADAAA claim because he is not a "qualified individual" with a disability and has not established a prima facie case of either discrimination or retaliation based on his alleged disability.

### 1.    *Discrimination*

The ADAAA prohibits discrimination "against a qualified individual on the basis of disability." Thus, to establish a prima facie case of discrimination under the ADAAA, a plaintiff must show that (1) he is disabled as defined under the ADAAA; (2) he is qualified, with or without reasonable accommodation by the employer, to perform the essential functions of the job; and (3) he was discriminated against because of his disability.

*Adair v. City of Muskogee*, 823 F.3d 1297, 1304 (10th Cir. 2016) (citing *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015) (internal citation omitted)). Since, in the Court's view, there is no direct evidence of disability discrimination, the analytical framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, guides the Court's analysis. *Hawkins*, 778 F.3d at 883; *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1220 (10th Cir. 2016). Applying *McDonnell Douglas* to the summary judgment context, a plaintiff initially must raise a genuine issue of material fact on each element of the prima facie case. If a plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision. If the defendant articulates a nondiscriminatory reason, the burden shifts back to the plaintiff to show a genuine issue of material fact as to whether the reason is pretextual. *Argo v. Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006). The burden of proof for a prima facie case is "not onerous." *Hawkins*, 778 F.3d at 883 (quoting *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005)).

Howard concludes the following conduct constitutes discrimination:

Defendant Shelite knew as early as February, 2013 of Mr. Howard's disability. ODOC also was aware that Mr. Howard was seeking treatment as early as May, 2013 and that he went on FMLA-qualifying leave in August, 2013. Even though they were aware of this, Defendants ignored his symptoms and continued to subject him to harassment. While he was on leave, he was terminated from

employment, scheduling his pre-termination hearing while he was incapacitated. Further, during this time he was told he would be transferred to LARC, and not a facility outside of District 13, as he requested, even though open positions were available. It is clear that Mr. Howard's disability played a role in his treatment by the Defendants and in his termination from employment.

Pl. Resp. Br. at 24.

Viewing the evidence in the light most favorable to Howard, the Court concludes he has failed to establish a triable issue regarding the discrimination element of his prima facie case. Even assuming, for purposes of this order, that Howard is disabled and qualified to perform the essential functions of a corrections officer with or without accommodations, the record is devoid of any evidence of discrimination based on his disability. The Court finds Howard's arguments are conclusory and that a reasonable trier of fact would not find Howard was discriminated against due to his PTSD. Although Defendants may have acted callously toward Howard during this time, mere threats, indignities, annoyances, petty oppressions and other callous and insensitive conduct are not actionable under the federal anti-discrimination laws. *See infra*. Moreover, there is no substantive evidence such actions were taken *because of* Howard's PTSD. Howard has failed to present a genuine dispute regarding whether he was discriminated against due to his disability and Defendants' motion should be granted on this issue.

## 2. *Retaliation*

To establish a prima facie case of retaliation, a plaintiff must prove that (1) he engaged in a protected activity; (2) he was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity; and (3) there was a causal connection between the protected activity and the adverse employment action. *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186-87 (10th Cir. 2016). An adverse action is one that produces "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742, 761 (1998). As noted, adverse actions do not include "petty slights, minor annoyances, and simple lack of good manners." *McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006) (quoting *Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The Court considers whether an action is "adverse" on a case-by-case basis, using an objective standard and "examining the unique factors relevant to the situation at hand." *Id.* (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998)).

Defendants contend Howard has failed to establish the third element: that a causal connection exists between the protected activity and adverse action. The Court agrees. The critical inquiry at this stage is whether Howard has demonstrated

that Defendants' actions occurred under circumstances which give rise to an inference of unlawful retaliation. *Proctor v. United Parcel Service*, 502 F.3d 1200, 1208 (10th Cir. 2007). The Tenth Circuit has repeatedly recognized that temporal proximity between protected conduct and termination is relevant evidence of a causal connection sufficient to justify an inference of retaliation. *Id.*; *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006). However, a plaintiff may rely on temporal proximity alone if the termination is very closely connected in time to the protected activity. *Id.* (citing *Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

Howard filed his amended administrative charge on June 5, 2013, and his termination letter was sent approximately six months later, on December 3, 2013. In this regard, the Tenth Circuit has stated "[f]our months is too large a time gap to establish a causal connection." *Proctor*, 502 F.3d at 1208 (citation omitted). Because a six-month time period does not support an inference of retaliatory motive, Howard must present additional evidence to establish the necessary causal connection. *See id.* at 1209 (citing *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007)); *see also Piercy*, 480 F.3d at 1198-99 ("[T]he passage of time does not necessarily bar a plaintiff's retaliation claim if additional evidence establishes the retaliatory motive."). As additional circumstantial evidence of retaliatory motive, Howard states:

> Any reasonable employee would find that the failure to remedy ongoing harassment was a materially adverse action, especially when this adverse action led to exacerbating symptoms of a disability. Further, any reasonable employee would find that termination from employment was materially adverse. ... Because the harassment was not stopped, Mr. Howard was required to take medical leave, which caused him to fall behind on his payment plan.

Pl. Resp. Br. at 17. These assertions do not support an inference of retaliatory action. Even when viewed collectively, an adverse employment action is a tangible change in working conditions that produces a material employment disadvantage, such as termination, cuts in pay or benefits, and changes that affect an employee's future career prospects. *Ellerth*, 524 U.S. at 761. Howard's complaints do not fall within this rubric. Moreover, Howard was offered an opportunity to transfer to another facility with similar benefits, and perhaps most damaging to his contention is the fact the decision to terminate Howard was based on his failure to pay state taxes – an event triggered by the Oklahoma Tax Commission, not ODOC. Under the circumstances presented here, the Court concludes a reasonable trier of fact would not find evidence of discriminatory retaliation.

## II. HOWARD'S CLAIMS UNDER TITLE VII AND 42 U.S.C. § 1981

### A. Hostile Work Environment

Title 42 U.S.C. § 1981 prohibits racial discrimination in the workplace. *See Lounds v. Lincare, Inc*., 812 F.3d 1208, 1221 (10th Cir. 2015) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, __ U.S. __, 133 S.Ct. 2517, 2529, 186 L.Ed.2d 503

(2013)). "Similarly, Title VII makes it an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. ... Both statutes authorize a plaintiff to bring a claim for hostile work environment based on unlawful race discrimination." *Id.* (internal citations and quotation marks omitted). "The same substantive standards apply to a hostile work environment claim regardless of whether the plaintiff has brought it under §1981 or Title VII." *Lounds*, 812 F.3d at 1221. (citing *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1410 (10th Cir. 1997); *Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir. 1994)). "Accordingly, [the Court is] guided in part by Title VII cases in assessing [Howard's] hostile work environment claim." *Id.*

Title VII does not establish a general civility code for the workplace, and a plaintiff may not predicate a hostile work environment claim on run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in the workplace. *Id.* at 1222. "Therefore, to avoid summary judgment at the prima facie stage, a plaintiff must present evidence that creates a genuine dispute of material fact as to whether 'the workplace is permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the victim's employment.' " *Lounds*, 812 F.3d at 1222 (citing *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir. 2007)). "Pervasiveness and severity are

independent and equal grounds on which to support violations of § 1981." *Id.*
(quoting *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998)).

Accordingly, to establish a prima facie case of a hostile work environment
based on race, Howard must establish that (1) he is a member of a protected group;
(2) he was subject to unwelcome harassment; (3) the harassment was based on
race; and (4) due to the harassment's pervasiveness and/or severity, a term,
condition, or privilege of his employment was altered and created an abusive
working environment. *Id.* (citing *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186
(10th Cir. 2007)). As the Tenth Circuit stated in *Lounds*:

> It is important to recognize that the severity and pervasiveness
> evaluation is particularly unsuited for summary judgment because it is
> inherently fact-found by nature. There is not, and by its nature cannot
> be, a mathematically precise test for a hostile work environment
> claim. To the contrary, the totality of the circumstances is the
> touchstone of a hostile work environment analysis. Courts consider a
> variety of factors in this holistic analysis, including the frequency of
> the discriminatory conduct; its severity; whether it is physically
> threatening or humiliating, or a mere offensive utterance; and whether
> it unreasonably interferes with an employee's work performance.
> Moreover, courts assess whether the work environment is both
> subjectively and objectively hostile or abusive. In other words, it is
> not enough that a particular plaintiff deems the work environment
> hostile; it must also be of the character that it would be deemed hostile
> by a reasonable employee under the same or similar circumstances.

*Lounds*, 812 F.3d at 1222 (citations, internal quotations and alterations omitted).

Thus, the Tenth Circuit has underscored that pervasiveness is not simply a
counting measure and "requires a broader contextual analysis that carefully

considers each instance as a component of the overall workplace milieu." *Id*. (citations omitted). "Much like a play cannot be understood on the basis of some of its scenes but only on its entire performance, which is the sum total of those scenes, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario, which is informed by the sum total of those incidents." *Id*. at 1223-24 (citations, internal quotations and alterations omitted). As the Federal Circuit in *King v. Hillen*, 21 F.3d 1572 (Fed. Cir. 1994), cited by the *Lounds* Court, observed: "by viewing each incident in isolation, *as if nothing else had occurred*, a realistic picture of the work environment is not presented." *Id*. at 1581 (alterations omitted, emphasis in original). Accordingly, Tenth Circuit precedent requires the Court to assess, in its analysis, comments and behavior that in many circumstances might appear to be facially neutral. *Lounds*, 812 F.3d at 1224.[4]

The dispositive question here is whether there is sufficient evidence of severity and pervasiveness on the record such that the Court should give a jury the opportunity to evaluate the evidence, demeanor, and candor of witnesses and make the ultimate determination. *Id*. at 1227. Stated another way, the Court must analyze

---

[4]Day's repeated utterance of the word "boy" in Howard's presence can be viewed as racially offensive. *See Tademy v. Union Pacific Corp*., 614 F.3d 1132, 1142 (10th Cir. 2008) ("As typically used in everyday English, there is nothing inherently offensive about the word 'boy.' Nevertheless, it is a term that has been used to demean African-American men, among others, throughout American history.").

the conduct at issue here with the aforementioned guidelines in mind and determine "whether a reasonable jury could find that the subjective and objective effect of the[] conduct was to pollute the environment with harassing conduct that was, inter alia, racially humiliating, offensive, or insulting." *Lounds*, 812 F.3d at 1228. The Court concludes the jury should be afforded an opportunity to undertake such a task. Whether the incidents at issue were as pervasive and severe as to constitute a hostile work environment is a question unsuited for summary judgment and best left for the jury to decide. *O'Shea v. Yellow Tech. Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999). The Court believes such evidence, and all reasonable inferences therefrom, viewed in the light most favorable to Howard, raises triable issues for jury determination. Howard has made a sufficient showing of conduct that could be viewed, under the totality of circumstances, as racially offensive and embarrassing. Accordingly, Defendants' motion on this issue is denied.[5]

---

[5] Defendants contend they are also entitled to the affirmative defense announced in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) (the *Ellerth/Faragher* defense). Although *Ellerth* and *Faragher* dealt with claims of sexual harassment, their reasoning is equally applicable to claims of racial harassment. *Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1270 (10th Cir. 1998). The *Ellerth/Faragher* defense requires proof that (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id*. at 1271. Defendants here are not entitled to the defense, as the record supports a finding that Howard filed grievances concerning conduct he deemed offensive, and thereby took advantage of corrective opportunities provided by ODOC.

**B.** **Racial Discrimination**

To establish a prima facie case of race discrimination under § 1981 and/or Title VII, a plaintiff must show: (1) he is a member of a racial minority; (2) he suffered an adverse employment action; and (3) similarly situated employees were treated differently. *Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1212 (10th Cir. 1998). As above, since there is no direct evidence of discrimination, the analytical framework under *McDonnell Douglas* applies to this claim.

At issue is whether Howard has satisfied the third prong, i.e., that he was treated differently than other similarly situated employees. Viewing the record evidence most favorably to Howard, he has presented evidence that other ODOC employees were deemed non-compliant regarding payment of taxes three or more times, but remained employed at ODOC.[6] For purposes of summary judgment, the Court will assume Howard and these employees are similarly situated. However, "[m]erely finding that people have been treated differently stops short of the crucial question: *why* people have been treated differently." *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1321 (10th Cir. 1992) (emphasis in original). Howard's evidence shows that he was treated differently than other employees, but his evidence does not, as it must, show that an *unlawful* motive explains the difference

---

[6] The record does not identify the races of the other employees.

in treatment. Unable to meet his burden to show pretext, the Court grants Defendants summary judgment on Howard's race discrimination claim.

## III.   INDIVIDUAL LIABILITY

Next, Defendants Addison and Shelite contend they are not subject to individual liability under § 1981 for Howard's racially hostile work environment claim.[7] Although § 1981 provides for individual liability,[8] a plaintiff must demonstrate that the individual defendant was personally involved in the alleged discrimination or that an affirmative link exists to causally connect the actor with the alleged discrimination. *See Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 983 (10th Cir. 1991) ("A claim seeking personal liability under section 1981 must be predicated on the actor's personal involvement."), *overruled on other grounds*, *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1228 (10th Cir. 2000); *see also Flores v. City and County of Denver*, 30 F. App'x 816, 819 (10th Cir. 2002) (unpublished).

Here, Howard has made no showing of a causal relationship between either Addison or Shelite and the hostile work environment Howard endured. At most,

---

[7] As the Court has granted summary judgment to Defendants on Howard's discrimination claim, it addresses this issue only as it relates to Howard's claim for racially hostile work environment.

[8] "[P]ersonal capacity suits against individual supervisors are inappropriate under Title VII." *Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir. 1996) (citation omitted).

Shelite was negligent in addressing Howard's concerns; however, even if this were the case, such negligence does not constitute the "personal involvement" or "affirmative link" necessary to support a claim of individual liability. Accordingly, the Court grants Defendants' motion on this issue.

## IV. HOWARD'S TORT CLAIMS

Lastly, Defendants seek summary judgment on Howard's common law tort claims for intentional infliction of emotional distress and negligent infliction of emotional distress. At the outset, Oklahoma does not recognize negligent infliction of emotional distress as an independent tort. *Kraszewski v. Baptist Med. Ctr. of Okla., Inc.*, 1996 OK 141, ¶ 1, 916 P.2d 241, 242 n. 1 ("[U]nlike a cause of action for intentional infliction of emotional distress, negligent infliction of emotional distress is not an independent tort."). It is, in effect, treated as negligence. *Id.*; *Wilson v. Muckala*, 303 F.3d 1207, 1213 (10th Cir. 2002). There are four elements to an intentional infliction of emotional distress claim: (1) the tortfeasor acted intentionally or recklessly; (2) the tortfeasor's conduct was extreme and outrageous; (3) the plaintiff actually experienced emotional distress; and (4) the emotional distress was severe. *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1558 (10th Cir. 1995) (citing *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 (10th Cir. 1991)). The tort does not extend to "mere insults, indignities, threats, or occasional acts that are inconsiderate and unkind." *Id.* at 1558 (citing

*Eddy v. Brown*, 1986 OK 3, ¶ 7, 715 P.2d 74, 76) (internal quotations and paraphrasing omitted). Instead, the tortfeasor's conduct must be "beyond all possible bounds of decency" or "utterly intolerable in a civilized community." *Id*. (quoting *Eddy*, 715 P.2d at 77). In fact, "[n]othing short of '*[e]xtraordinary* transgressions of the bounds of civility' will give rise to liability for intentional infliction of emotional distress." *Id*. (quoting *Merrick v. Northern Natural Gas Co*., 911 F.2d 426, 432 (10th Cir. 1990) (emphasis in original).

Howard does not refute that Oklahoma does not recognize negligent infliction of emotional distress as an independent tort and has provided no argument in support of a negligence claim. Furthermore, there is no evidentiary support for a finding of intentional infliction of emotional distress. Even when viewed in the light most favorable to Howard, the conduct at issue is not so atrocious and utterly intolerable as to "progress beyond all possible bounds of decency," and accordingly, it does not rise to the level necessary to permit recovery under the tort of intentional infliction of emotional distress. *Compare Herrera v. Lufkin Industries, Inc*., 474 F.3d 675, 688 (10th Cir. 2007) (conduct actionable under Title VII does not necessarily rise to the level of outrageousness required for intentional infliction of emotional distress). After examining the record and resolving all reasonable inferences in the light most favorable to

Howard, the Court finds Howard has failed to demonstrate a genuine issue for trial as to his claim for intentional infliction of emotional distress.

## CONCLUSION

Defendants' Motion for Summary Judgment [Doc. No. 16] is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

**IT IS SO ORDERED** this 20th day of March, 2017.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE